[Cite as *State v. Walker*, 2024-Ohio-484.]

IN THE COURT OF APPEALS OF OHIO
SECOND APPELLATE DISTRICT
MONTGOMERY COUNTY

| | | |
|---|---|---|
| STATE OF OHIO | : | |
| | : | |
| Appellee | : | C.A. No. 29729 |
| | : | |
| v. | : | Trial Court Case No. 2018 CR 04120 |
| | : | |
| QUENTON WALKER | : | (Criminal Appeal from Common Pleas |
| | : | Court) |
| Appellant | : | |
| | : | |

. . . . . . . . . . .

O P I N I O N

Rendered on February 9, 2024

. . . . . . . . . . .

JOSEPH C. PATITUCE & CATHERINE MEEHAN, Attorneys for Appellant

MATHIAS H. HECK, JR., by SARAH H. CHANEY, Attorney for Appellee

. . . . . . . . . . . .

LEWIS, J.

{¶ 1} Defendant-Appellant Quenton Walker appeals from a judgment of the Montgomery County Common Pleas Court convicting him of two counts of having weapons while under disability following a bench trial and one count of attempted possession of marijuana (5,000 grams or more but less than 20,000 grams) following a

guilty plea. For the following reasons, we affirm the judgment of the trial court.

## I. Facts and Procedural History

{¶ 2} On December 31, 2018, Walker was indicted by a Montgomery County grand jury on one count of trafficking in cocaine (100 grams or more), in violation of R.C. 2925.03(A)(2), a felony of the first degree with a one-year firearm specification; one count of trafficking in marijuana (40,000 grams or more), in violation of R.C. 2925.03(A)(2), a felony of the second degree with a one-year firearm specification; one count of possession of cocaine (100 grams or more), in violation of R.C. 2925.11(A), a felony of the first degree with a one-year firearm specification; one count of possession of marijuana (5,000 grams or more but less than 20,000 grams), a felony of the third degree with a one-year firearm specification; one count of possession of marijuana (20,000 grams or more but less than 40,000 grams), in violation of R.C. 2925.11(A), a felony of the second degree; and three counts of having weapons while under disability (prior drug conviction), each in violation of R.C. 2923.13(A)(3), felonies of the third degree. All charges arose as a result of evidence collected during the execution of three residential search warrants.

{¶ 3} Walker filed a motion to suppress evidence obtained during the execution of the three residential search warrants at issue, which related to 1460 and 1522 Tampa Avenue in Dayton, Ohio, and 4963 Magellan Avenue in Trotwood, Ohio. Although Walker also challenged the validity of a search warrant requesting global positioning system ("GPS") location information, the State agreed not to use any information at trial related to that warrant. Walker claimed there was insufficient probable cause for the

search warrants to have been granted and further claimed that the affiant of the search warrants failed to include certain information or provided information that was false or misleading, in violation of *Franks v. Delaware*, 438 U.S. 154, 98 S.Ct. 2674, 57 L.Ed.2d 667 (1978). Relevant here, two firearms were recovered from 1460 Tampa Avenue, which formed the basis of the two counts of having weapons while under disability for which Walker was later convicted.

{¶ 4} A hearing was held on the motion to suppress on March 22, 2019. At the hearing, the State introduced copies of the search warrants and submitted the testimony of Dayton Police Detective Gregory Orick. Detective Orick testified that he had been a police officer with the Dayton Police Department for 20 years and had been a detective in the Narcotics Bureau since 2011. He began investigating Walker around January 2016. As part of his nearly two-year investigation, Orick conducted surveillance on multiple locations, conferred with a confidential informant ("CI"), and eventually obtained several search warrants. According to Orick, the CI was someone upon whom he had previously relied to successfully seize drugs, weapons, and money tied to drug trafficking.

{¶ 5} According to Detective Orick's affidavit in support of the search warrant, in January 2016, a CI informed Orick that a large number of narcotics were being trafficked out of 1460 Tampa Avenue, Dayton, Ohio. The CI identified Walker as the individual selling the narcotics. Orick personally observed Walker at multiple locations, including 1460 Tampa Avenue, which was believed to be owned by Walker's father and was alleged to be the primary location for the distribution of narcotics, whereas 4963 Magellan Avenue was Walker's primary residence where he lived with his wife, Thenda Abbott. The

properties at 4963 Magellan Avenue and 1522 Tampa Avenue were in Abbott's name, as was the vehicle Walker was observed driving.

{¶ 6} Although his investigation started in January 2016, Detective Orick temporarily stopped his investigation of Walker around September 2016, because the Montgomery County R.A.N.G.E. Task Force wished to investigate Walker. According to the Task Force, they had reliable information that Walker kept the proceeds of his drug trafficking business inside his residence at 4963 Magellan Avenue. After approximately three months, Detective Orick reinitiated his investigation of Walker. The Task Force did not give Orick specific information from their investigation, but they told him they had not found anything. The fact that the Task Force had not found anything was not included in the affidavit for the search warrant.

{¶ 7} Detective Orick stated that he had conducted surveillance approximately 10-12 hours per week on average. Orick noted that, during his surveillance period, the trash was set out at 1460 Tampa Avenue only three times, which was inconsistent with normal behavior and the amount of traffic observed at the house. However, no trash pulls were conducted to search the contents of the trash for incriminating evidence. Additionally, during the surveillance period, three vehicles were stopped for traffic violations after leaving 1460 Tampa Avenue that were suspected of being involved in drugs. No drugs or contraband were found in those vehicles. It was determined that the individuals in those vehicles were private contractors who were working on the house, which was in the process of being remodeled. Neither the information about the traffic stops nor the failure to conduct any trash pulls was included in the affidavit for the search warrant.

{¶ 8} Detective Orick explained that the first search warrant he drafted sought GPS location information from a cell phone. Then, in order to create the 1460 Tampa Avenue search warrant affidavit, Orick copied the affidavit used to support the GPS search warrant but inadvertently omitted a paragraph involving the CI's observations in November 2017. The missing paragraph read: "In November of 2017 the CI associated with this investigation indicated that he or she had seen three kilos of cocaine and a small amount of marijuana inside 1460 Tampa Avenue." The affidavit did, however, include information disclosed by the CI of having seen large amounts of drugs inside 1460 Tampa Avenue in July 2017, on October 27, 2017, in December 2017, on January 28, 2018, and on or about February 5, 2018. Detective Orick averred that he had observed an increase in foot traffic at the home after the CI disclosed observing large amounts of drugs in the 1460 Tampa Avenue residence on the two occasions when specific dates were provided.

{¶ 9} The search warrant for 1460 Tampa Avenue was obtained and executed on February 5, 2018. Following the recovery of contraband at 1460 Tampa Avenue, the two other residential search warrants were requested and executed on February 5, 2018. Because neither the 1522 Tampa Avenue nor the 4963 Magellan Avenue search warrant is particularly relevant to this appeal, we will not go into detail regarding the testimony and evidence submitted regarding those search warrants.

{¶ 10} On May 6, 2019, the trial court overruled Walker's motion to suppress in its entirety. The trial court found that there had been sufficient probable cause for the 1460 Tampa Avenue and 4963 Magellan Avenue search warrants to be issued. In the alternative, the trial court found that the good faith exception to the exclusionary rule

applied to prevent the suppression of evidence as to those residences. The trial court found that there had not been sufficient probable cause to issue the 1522 Tampa Avenue search warrant but concluded that the good faith exception to the exclusionary rule also applied to the search warrant for that property, preventing the exclusion of any evidence obtained from that location. Finally, the trial court rejected Walker's request for a *Franks* hearing, reasoning that any omissions were inadvertent and not intended to mislead the issuing judges or made with reckless disregard for misleading the judges.

{¶ 11} On May 10, 2021, Walker waived a jury trial only for the three counts of having weapons while under disability. The remaining counts were tried to a jury beginning on April 25, 2021, with the trial court simultaneously considering the evidence presented at trial as it related to the having weapons while under disability charges.

{¶ 12} Prior to the presentation of evidence at trial, several stipulations were read into the record for the jurors, including that the Dayton Police Department had executed three search warrants on February 5, 2018, at 1460 Tampa Avenue, 4963 Magellan Avenue, and 1522 Tampa Avenue. The parties also stipulated to the accuracy and authenticity of photographs taken at the various locations, items recovered from the three search warrants, and the presence of certain officers during the execution of the search warrants. In addition to stipulating to all of the drug analyses that had been completed, the parties stipulated that the two Glock firearms recovered from 1460 Tampa Avenue and the firearm recovered from 4963 Magellan Avenue had been deemed operable by a firearms expert.

{¶ 13} Although not submitted to the jurors, the parties also stipulated that Walker

had previously been convicted of trafficking in cocaine and/or possession of cocaine in 2004 in the Hamilton County Common Pleas Court. This stipulation was separately provided to the trial court for the three counts of having weapons while under disability.

{¶ 14} Lieutenant Mark Ponichtera of the Dayton Police Department testified at trial that he had been with the Dayton Police Department for 30 years and was the Narcotics Bureau Commander. On February 5, 2018, he assisted in the execution of all three residential search warrants.[1] He testified that, upon arriving at 1460 Tampa Avenue, police officers knocked on the door and called out "Police Search Warrant" prior to forcing entry with a ram. Additionally, Ponichtera had a bullhorn and repeatedly stated "Dayton Police, Drug Search Warrant" and the address connected with the search warrant to identify themselves as police officers prior to entering the residence. He did not enter the residence himself.

{¶ 15} Detective Brian Dedrick of the Dayton Police Department testified that he had been in law enforcement since 2002 and a detective with the Narcotics Bureau for over 11 years. On February 5, 2018, Detective Dedrick was one of eight officers assigned to make entry into 1460 Tampa Avenue. Dedrick knocked loudly on the front door of the house and announced, "Dayton Police, Search Warrant." After giving approximately 20 seconds for someone to answer the door, another officer used a ram to force open the front door because nobody came to open it. Immediately upon entering the home, two males were found in the living room, which was just to the right of the front

[1] Because Walker focuses his appeal on the two counts of having weapons while under disability for the two firearms recovered from 1460 Tampa Avenue, we will limit our discussion to the facts relevant to these two offenses and will not refer to all the testimony and evidence regarding the other offenses and locations submitted at trial.

door. Dedrick assisted in collecting evidence inside the home and assisted with the other two search warrants that were executed that day.

{¶ 16} Detective Mistan Bailey, an eight-year veteran of the Dayton Police Department Street Crimes Unit, assisted with the execution of the three search warrants on February 5, 2018. She took photographs of each of the locations and the items confiscated from each place, including the two firearms recovered from 1460 Tampa Avenue. One of the firearms was recovered from inside a vent in the living room of the home; the other firearm was found shoved into a chair in the living room. Both firearms were photographed and collected. DNA samples were taken from each of the two firearms and submitted to the Miami Valley Regional Crime Laboratory for testing. Detective Bailey also participated in the execution of the search warrant for 4963 Magellan Avenue, where she located a third Glock firearm in the master bedroom closet. A DNA sample was taken of that firearm and submitted to the lab as well.

{¶ 17} Mary Barger, who was a forensic scientist in the serology and DNA section of the Miami Valley Regional Crime Laboratory, testified to the comparison testing she had completed of the touch DNA samples taken from the two firearms recovered from 1460 Tampa Avenue and a DNA standard taken from Walker. As to the firearm recovered from the chair, Barger testified she obtained insufficient results; meaning that she could see indications that some DNA was present, but because there was so little DNA there, she could not compare it to anyone. For the firearm recovered from inside the vent, Barger obtained a partial mixed profile. She explained that a partial mixed profile indicated that there was very little DNA present, and she only picked up a portion

of the markers she was looking for. Because it was a mixture, she could observe DNA from more than one person on the gun. From the mixed partial profile, she could not exclude Walker as being a part of the mixture. That meant that when she looked at the mixed DNA profile and compared it to Walker's known DNA standard, she could see his specific DNA types present within the mixed profile. In contrast, Barger testified that an exclusion meant that she did not see any of the particular individual's DNA present that she was comparing to the unknown DNA sample. Barger also verified that the sex marker of the mixed partial profile on the firearm from the vent contained male DNA. As for the third firearm recovered from 4963 Magellan Avenue, Barger testified that she obtained insufficient results such that she was unable to compare it to any DNA standard.

{¶ 18} Detective Jason Barnes, a narcotics detective with the Dayton Police Department with over 20 years' experience in law enforcement, testified that he was assigned the lead entry role to execute the search warrant at 1460 Tampa Avenue on February 5, 2018. Another officer made the announcement that the police were there while Detective Barnes was at the front door of the house. Because no one responded to the front door, a ram was used to force entry inside. Once the door opened, Barnes observed two individuals in the front room; one was Walker and the other was Garland Fletcher. Walker and Fletcher were told to get onto the ground, which they did. Eventually, they were handcuffed, and Walker was arrested. Barnes participated in the search of the home and located several items seized into evidence, including the Glock handgun located in the vent, which he swabbed for DNA. Barnes also recovered a piece of mail from the basement closet that was addressed to "Quenton Walker" with the

address of 1460 Tampa Avenue.

{¶ 19} Sergeant Jonathan Sopczak from the Dayton Police Department testified that on February 5, 2018, he was a detective assigned to the Narcotics Bureau and worked in the Street Crimes Unit. He was assigned to tag and log all the evidence recovered from the searches into an inventory list and take custody of all the items. This included multiple cell phones, large amounts of marijuana and cocaine, a vacuum sealer and bags, over $102,000 in cash, and DNA samples. Of significance here, Sergeant Sopczak recorded that Detective Howard recovered the Glock firearm from the chair in the living room. He also recorded that Detective Barnes recovered the Glock firearm from the vent in the living room. Both firearms were shown to the jury and submitted as exhibits. Additionally, a document from Window City Plus was located in a filing cabinet in an office on the second floor of the home, which showed a proposal submitted to Tim Vaught on September 25, 2017, and was signed "Q. Walker." Nothing was found with Thenda Abbott's name on it at 1460 Tampa Avenue.

{¶ 20} Sergeant Sopczak also testified about the evidence recovered from executing the search warrant at 4963 Magellan Avenue. Of relevance, police located a job invoice on the nightstand in the master bedroom which stated sold to "Q" on "Tampa Avenue" from a "T. Vaught." It was dated September 24, 2017. Although on a different form, the document appeared to reference the same project as the proposal to Tim Vaught recovered from 1460 Tampa Avenue and identified Vaught with the same phone number on each document.

{¶ 21} Detective John Howard of the Dayton Police Department testified that he

worked in the Street Crimes Unit in an undercover narcotics capacity for approximately nine years. On February 5, 2018, Detective Howard assisted with the execution of the three search warrants involved in this case. At 1460 Tampa Avenue, Howard was assigned to the entry team, and he had possession of the ram. After the officers knocked on the door, they waited 20-30 seconds for someone to respond, and then Howard used the ram to breach the interior door. Once inside, the occupants were ordered to the ground, Howard helped clear the structure, and then he assisted in the search of the home. He also assisted in the arrest and search of Walker. During the search of his person, a set of keys was removed from Walker's front pocket along with approximately $1,000 cash in small bills from his other front pocket and wallet. The keys were tested on the front entry doors to 1460 Tampa Avenue, and they worked.

{¶ 22} Detective Howard also assisted on the other two search warrants. At 1522 Tampa Avenue, the search warrant was for the detached garage located at that property, not the house. Of relevance here, inside the garage was a white Chevy Impala that was searched. Inside the center console, Howard found a DP&L bill that was addressed to Walker at his 4963 Magellan Avenue address but was for electric service at the 1460 Tampa Avenue residence. Detective Orick later testified that the Chevy Impala was registered in Walker's wife's name.

{¶ 23} Detective Gregory Orick was the State's last witness to testify. Detective Orick was employed by the Dayton Police Department and assigned to the Narcotics Bureau. However, he was also a taskforce officer with the Drug Enforcement Administration, meaning that he did narcotics investigations for both the local and federal

governments.   Detective Orick had over 30 years of experience in law enforcement.

{¶ 24} As the assigned case detective, Detective Orick began investigating Walker in January 2016.   He developed information that Walker was selling and storing large amounts of marijuana and cocaine and had large amounts of U.S. currency inside a house at 1460 Tampa Avenue.   Orick observed that Walker was on the property and learned that Walker's main residence was at 4963 Magellan Avenue.   Through various open records sources, Orick learned that the 1460 Tampa Avenue residence was registered to an individual Orick originally believed was Walker's father, but he later learned the person was Walker's brother.   The residence at 1522 Tampa Avenue was registered to Walker's wife.   Orick frequently observed Walker drive to 1522 Tampa Avenue, park his car either in the driveway or the garage, and then walk over to 1460 Tampa Avenue.

{¶ 25} Over the course of about two years, Detective Orick developed information that marijuana, cocaine, and large amounts of money were at 1460 Tampa Avenue. When he was provided that information, Detective Orick would conduct surveillance of the home.   He would spend approximately 10-11 hours per week on average surveilling the home.   During his surveillance, Orick saw Walker come to the property and then, shortly thereafter, other people would arrive at the home.   Sometimes people would be waiting on the front sidewalk talking and then would go inside when Walker came to the front door.   After about 15-20 minutes, people would start filtering out of the house. Based on his experience and the information he was receiving, Orick believed this behavior was indicative of narcotic activity.

{¶ 26} Walker primarily used the front entrance door of 1460 Tampa Avenue, for

which he had keys, and allowed people to go into the front of the house. However, Detective Orick also observed Walker sometimes park in the back area and enter through the back door of the home. Orick observed Walker assisting maintenance workers or individuals who looked like they were doing work on the house. He later learned that the home was being renovated. Orick never saw the workers go into the home without Walker first letting them inside.

{¶ 27} During the course of the investigation, Detective Orick observed Walker's wife occasionally go into the residence at 1460 Tampa Avenue on her own. However, the majority of the time he observed Walker enter the home alone.

{¶ 28} Periodically when Detective Orick drove by the house at nighttime, he did not see any lights on inside the house, although the porch light would be on. Additionally, during the course of the first year that he was surveilling the home, Orick only observed the trash put out three times. To him, that was indicative that people were not using the house on a consistent basis, such as cooking food regularly. In contrast, the trash at other homes in the area would be put out weekly.

{¶ 29} On February 4, 2018, Detective Orick was provided information that there were large amounts of cocaine and money inside 1460 Tampa Avenue. The next day, while Orick was in the alley behind 1460 Tampa Avenue, he observed Walker come up the alley, open the garage door with a remote, back his car into the garage, and shut the door. He then saw Walker enter the rear of the home. Orick left the residence and obtained the search warrant, which was executed that afternoon.

{¶ 30} Detective Orick was present during the initial entry into 1460 Tampa Avenue

and observed the layout of the home. After the officers entered, Walker and Fletcher were told to get on the ground, which they did. Walker was located within arm's reach of a reclining chair in which officers later recovered a Glock pistol shoved down into the side. Orick explained that the vent in the living room in which a firearm was found was a floor vent near the baseboard of the front living room. The vent went down and then was horizontal, parallel to the floor. The officers had to reach into the vent to get the handgun out. Although there was a piece of mail addressed to Walker at the 1460 Tampa Avenue address, no other bills or mail were found there addressed to anyone else. In total, at 1460 Tampa Avenue, police recovered over 10,200 grams of marijuana, over 1,750 grams of cocaine, and the two firearms.

{¶ 31} While other detectives were executing the search warrant at 1460 Tampa Avenue, Detective Orick completed the remaining two search warrants, which were subsequently executed that same day. When Orick went to 4963 Magellan Avenue, he met with Walker's wife, who informed him that she had a firearm that belonged to her, that being the Glock found in the bedroom closet. She also gave officers a key to enter the home.

{¶ 32} After the State rested and Walker's Crim.R. 29 motion was overruled, Garland Fletcher testified for the defense. Fletcher testified that, when his mother died, Walker's mother had taken him in, so he and Walker had grown up together since they were children. Fletcher and Walker worked together fixing houses. Fletcher was familiar with 1460 Tampa Avenue, which he visited frequently in 2018; he claimed it belonged to Walker's brother. Fletcher was present on February 5, 2018, when the

police conducted their search. That day, Fletcher was dropped off at 1450 Tampa Avenue, which was Walker's mother's home. Fletcher helped carry some groceries inside, then he did some drywall work with Walker at a neighboring house. Walker left, but when he returned, he asked if Fletcher was ready to eat, and they went to Church's Chicken for food. After they got the food, they went to 1460 Tampa Avenue and were sitting in the living room eating when he heard a loud boom at the front door. According to Fletcher, Walker got up, looked out front, and said the police were there. Walker then unlocked the door and let the police inside. Once the police entered, he and Walker were told to get on the ground, which they did. Both he and Walker were handcuffed, but he was later released by the police.

{¶ 33} At the conclusion of the jury trial, Walker was found not guilty on all but one count, that being possession of marijuana (5,000 grams or more but less than 20,000 grams), a felony of the third degree with a one-year firearm specification. On that count, the jury was unable to reach a verdict.

{¶ 34} Regarding the charges tried to the judge, the trial court found Walker guilty of two counts of having weapons while under disability for the firearms recovered from 1460 Tampa Avenue but not guilty of having weapons while under disability for the firearm recovered from 4963 Magellan Avenue. Walker was sentenced to 36 months in prison on each of the two counts of having weapons while under disability, which the trial court ordered to be served consecutively to each other.

{¶ 35} The possession of marijuana count on which the jury did not reach a verdict was scheduled for re-trial. Prior to trial, however, Walker entered a negotiated guilty plea

to one count of attempted possession of marijuana, in violation of R.C. 2923.02(A) and R.C. 2925.11, a felony of the fourth degree, in exchange for the State's reducing the charge and dismissing the firearm specification. Walker was sentenced to 18 months in prison for attempted possession of marijuana, to run concurrently with the previously imposed 72-month prison term for the having weapons while under disability convictions.

{¶ 36} Walker timely appealed. He challenges only his two convictions of having weapons while under disability and raises the following five assignments of error:

1. THE STATE FAILED TO PRESENT SUFFICIENT EVIDENCE TO PROVE EACH AND EVERY ELEMENT OF THE OFFENSE BEYOND A REASONABLE DOUBT.

2. APPELLANT'S CONVICTION WAS AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE.

3. TRIAL COUNSEL'S PERFORMANCE WAS SO INEFFECTIVE THAT IT AFFECTED THE OUTCOME OF THE TRIAL AND VIOLATED APPELLANT'S CONSTITUTIONAL RIGHTS.

4. THE TRIAL COURT ERRED IN DENYING APPELLANT'S MOTION TO SUPPRESS AND FINDING THE GOOD FAITH EXCEPTION.

5. THE COURT ERRED IN IMPOSING CONSECUTIVE SENTENCES.

{¶ 37} For purposes of clarity, we will consider Walker's fourth assignment of error first.

## II. Motion to Suppress

{¶ 38} In his fourth assignment of error, Walker contends that the affidavit for the

search warrant for 1460 Tampa Avenue failed to set forth a substantial basis to support a determination that probable cause existed. Specifically, Walker alleges that the search warrant lacked a sufficient nexus for the police to confiscate any firearms as there was no information Walker had been connected to any firearms and, further, that the trial court erred in finding that Walker was sufficiently connected to 1460 Tampa Avenue when it was not owned by him. Alternatively, Walker contends that the good-faith exception should not have applied to justify a lack of probable cause in the affidavit.

{¶ 39} The State argues that because Walker pleaded guilty to attempted possession of marijuana, he waived his right to challenge any pre-trial rulings. Alternatively, the State argues that the trial court did not err in overruling Walker's motion to suppress because the search warrant affidavit contained sufficient probable cause. Furthermore, even if the search warrant affidavit did not contain sufficient probable cause, the officers reasonably relied on the warrant in good faith to preclude suppression of any evidence.

{¶ 40} Although Walker entered a guilty plea to the attempted drug possession charge, he did not plead guilty to the two counts of having weapons while under disability. As Walker pled not guilty to those charges, which were tried to the bench, Walker did not waive his right to appeal any pre-trial rulings related to the firearms offenses, and we will consider his arguments.

### a. Standard of Review

{¶ 41} "[A]ppellate review of a motion to suppress presents a mixed question of law and fact." *State v. Codeluppi*, 139 Ohio St.3d 165, 2014-Ohio-1574, 10 N.E.3d 691,

¶ 7, citing *State v. Burnside*, 100 Ohio St.3d 152, 2003-Ohio-5372, 797 N.E.2d 71, ¶ 8. "The reviewing court must accept the trial court's findings of fact if they are supported by competent, credible evidence, and the court reviews the trial court's legal conclusions de novo." *State v. LaRosa*, 165 Ohio St.3d 346, 2021-Ohio-4060, 179 N.E.3d 89, ¶ 17, citing *Burnside* at ¶ 8.

### b. Search Warrant

{¶ 42} "The Fourth Amendment to the United States Constitution and Article I, Section 14 of the Ohio Constitution provide that search warrants may only be issued upon probable cause, supported by oath or affirmation, particularly describing the place to be searched, and the person and/or things to be seized." *State v. Perez*, 2015-Ohio-1753, 32 N.E.3d 1010, ¶ 9 (2d Dist.). In determining the sufficiency of probable cause in an affidavit submitted in support of a search warrant, "[t]he task of the issuing magistrate is simply to make a practical, common-sense decision whether, given all the circumstances set forth in the affidavit before him, including the 'veracity' and 'basis of knowledge' of persons supplying hearsay information, there is a fair probability that contraband or evidence of a crime will be found in a particular place.." *Illinois v. Gates*, 462 U.S. 213, 238, 103 S.Ct. 2317, 76 L.Ed.2d 527 (1983).

{¶ 43} In contrast, "the duty of a reviewing court is simply to ensure that the magistrate had a 'substantial basis for…conclud[ing]' that probable cause existed." *Id.* at 238-239, quoting *Jones v. United States*, 362 U.S. 257, 271, 80 S.Ct. 725, 4 L.Ed.2d 697; *State v. Castagnola*, 145 Ohio St.3d 1, 2015-Ohio-1565, 46 N.E.3d 638, ¶ 35. "In conducting any after-the-fact scrutiny of an affidavit submitted in support of a search

warrant, trial and appellate courts should accord great deference to the magistrate's determination of probable cause, and doubtful or marginal cases in this area should be resolved in favor of upholding the warrant." *State v. George*, 45 Ohio St.3d 325, 544 N.E.2d 640 (1989), paragraph two of the syllabus. "In reviewing whether a search warrant has been issued upon probable cause, courts must examine the totality of the circumstances." *State v. Maranger*, 2018-Ohio-1425, 110 N.E.3d 895, ¶ 27 (2d Dist.), citing *State v. Jones*, 143 Ohio St.3d 266, 2015-Ohio-483, 37 N.E.3d 123, ¶ 15.

{¶ 44} If "a reviewing court determines that a warrant should not have been issued, it must then determine whether the good-faith exception applies, and that question is a question of law, subject to de novo review by the appellate court." *Castagnola* at ¶ 32, citing *United States v. Leary*, 846 F.2d 592, 606 (10th Cir.1988). "Under the good-faith exception, evidence obtained during a search conducted pursuant to a warrant that is unsupported by probable cause will not be excluded if the officers who obtained the evidence acted reasonably in relying on the warrant." (Citations omitted.) *State v. Dibble*, 159 Ohio St.3d 322, 2020-Ohio-546, 150 N.E.3d 912, ¶ 9.

### c. Waiver

{¶ 45} As a preliminary matter, Walker did not argue in the trial court that the search warrant lacked a nexus to the firearms, which would be an argument that the scope of the warrant exceeded the probable cause to authorize seizure of the firearms. The only issue before the trial court at the hearing on March 22, 2019, and the only issue the court addressed was whether there was sufficient probable cause to support the issuance of the search warrant. In the context of a suppression motion, Crim.R. 47

"requires a motion in a criminal case to state 'with particularity the grounds upon which it is made.' Based on Crim.R. 47, Ohio's appellate courts have required suppression motions to identify with particularly the asserted grounds for suppressing evidence and have found waiver when specific grounds for suppression are not raised in the trial court." *State v. Johnson*, 2d Dist. Greene No. 2019-CA-64, 2020-Ohio-4159, ¶ 17. To the extent Walker suggests that the firearms should not have been seized based on a lack of nexus in the search warrant, we conclude that Walker waived all but plain error because he failed to raise this challenge in the trial court. *State v. Terrell*, 2017-Ohio-7097, 95 N.E.3d 870, ¶ 67 (2d Dist.). "Notice of plain error * * * is to be taken with the utmost caution, under exceptional circumstances and only to prevent a manifest miscarriage of justice." *State v. Long*, 53 Ohio St.2d 91, 372 N.E.2d 804 (1978), paragraph three of the syllabus.

### d. Analysis

{¶ 46} In this case, the trial court found that the 1460 Tampa Avenue warrant was supported by probable cause. We agree. The facts submitted in the affidavit gave the judge issuing the warrant a substantial basis for concluding that a fair probability existed that there would be evidence of drug possession and drug trafficking inside the residence at 1460 Tampa Avenue.

{¶ 47} Detective Orick had 20 years of experience as a Dayton police officer and had been a detective in the Narcotics Bureau since 2011. According to Orick's affidavit, in January 2016, a CI who had previously provided reliable information resulting in the recovery of weapons, drugs, money, and successful convictions informed Orick that a

large amount of narcotics was being trafficked out of 1460 Tampa Avenue. Walker was positively identified as the individual selling the narcotics. Orick personally observed Walker at 1460 Tampa Avenue, which he believed to be owned by Walker's father.

{¶ 48} Detective Orick stated that, during the course of his investigation, he had conducted surveillance approximately 10-12 hours a week. Although no trash pulls were done, Orick noted that during his lengthy surveillance period, the trash was only set out at 1460 Tampa Avenue three times, which was inconsistent with normal behavior and the amount of traffic observed.

{¶ 49} According to the affidavit, the CI observed large amounts of drugs in the 1460 Tampa Avenue residence on several occasions, which was reported to Detective Orick, who then observed increased foot traffic at the residence at those times. Notably, the affidavit indicated that the CI had personally observed a large amount of cocaine inside of 1460 Tampa Avenue on or about February 5, 2018. Orick and other Dayton detectives observed Walker park his car in the garage at 1460 Tampa Avenue and saw Walker on the property on February 5, 2018. Orick obtained a search warrant for the home that afternoon.

{¶ 50} Walker emphasizes that because 1460 Tampa Avenue was not Walker's home, there was insufficient probable cause to issue the search warrant. We disagree. In order to issue a search warrant, a magistrate must decide whether there is sufficient probable cause to believe that "there is a fair probability that evidence of a crime will be found in a particular place." *Castagnola*, 145 Ohio St.3d 1, 2015-Ohio-1565, 46 N.E.3d 638, at ¶ 34. Crim.R. 41(C)(1) requires an affidavit in support of the search warrant to

"particularly describe the place to be searched, name or describe the property to be searched for and seized, state substantially the offense in relation thereto, and state the factual basis for the affiant's belief that such property is there located." Given that the search warrant at issue here sought the search of a place rather than a person, the sufficiency of the probable cause related to the location to be searched, not who owned the location. It was of no consequence that Walker was not the owner of 1460 Tampa Avenue or that he did not live there, facts which Detective Orick included in his affidavit to support the search warrant. Based on the totality of the circumstances stated in the affidavit, the issuing magistrate had a substantial basis to conclude that there was a fair probability that evidence of drug possession and drug trafficking would be found at 1460 Tampa Avenue. Because the search warrant that produced the evidence Walker moved to suppress was supported by probable cause, we need not consider whether the good-faith exception to the exclusionary rule applied.

{¶ 51} We also conclude that plain error is not demonstrated as related to the scope of the warrant. In the affidavit submitted in support of the search warrant for 1460 Tampa Avenue, Detective Orick requested a search warrant that would allow the police to search for and seize "all weapons" associated with drug trafficking. Although the affidavit did not indicate that the CI had personally observed Walker with a firearm or other weapon, it did indicate that the CI had previously "given information which ha[d] been verified through independent investigation to be true and which ha[d] led to the issuance of search warrants, with the recovery of weapons, drugs, money, and convictions." The CI provided information that drugs had been trafficked out of 1460

Tampa Avenue, and large amounts of drugs were observed at the location on multiple occasions. The CI also identified Walker as the individual who was trafficking drugs out of the home. Detective Orick further provided information in the affidavit regarding his extensive training and experience involving drug investigations. He had 20 years of experience as a Dayton police officer and had been a detective since 2011, with nearly 7 years' service in the Narcotics Bureau. He specifically indicated that in his experience, "firearms are commonly kept and located inside operating drug houses and/or apartments." We have previously acknowledged the "well recognized nexus between guns and drug activity, particularly where * * * the suspected drug activity involves drug trafficking and not merely use or possession of drugs," in order to justify pat downs for weapons. *State v. Pattson*, 2d Dist. Montgomery No. 24224, 2011-Ohio-3507, ¶ 20. *See also State v. Evans*, 67 Ohio St.3d 405, 413, 618 N.E.2d 162 (1993), quoting *United States v. Ceballos*, 719 F.Supp. 119, 126 (E.D.N.Y.1989) ("[t]he right to frisk is virtually automatic when individuals are suspected of committing a crime, like drug trafficking, for which they are likely to be armed. * * * 'The nature of narcotics trafficking today reasonably warrants the conclusion that a suspected dealer may be armed and dangerous.' "). Orick's statements reflected a similar connection between drug trafficking establishments and weapons based on his training and experience. Consequently, we conclude that the affidavit provided a sufficient basis for a magistrate to find probable cause to issue a search warrant allowing officers to search for and confiscate any firearms found at 1460 Tampa Avenue.

{¶ 52} Walker's fourth assignment of error is overruled.

### III.    Manifest Weight and Sufficiency of the Evidence

{¶ 53} In his first and second assignments of error, Walker challenges his convictions for having weapons while under disability as being against the sufficiency and manifest weight of the evidence.   Specifically, Walker disputes that the State proved he knowingly acquired, had, carried, or used either of the firearms recovered from the 1460 Tampa residence.   Because these two arguments are interrelated, we will address them together.

### a.   Standards of Review

{¶ 54} "The legal concepts of sufficiency of the evidence and weight of the evidence are both quantitatively and qualitatively different."   *State v. Thompkins*, 78 Ohio St.3d 380, 678 N.E.2d 541 (1997), paragraph two of the syllabus.   "In a sufficiency-of-the-evidence inquiry, the question is whether the evidence presented, when viewed in a light most favorable to the prosecution, would allow any rational trier of fact to find the essential elements of the crime beyond a reasonable doubt."   *State v. Groce*, 163 Ohio St.3d 387, 2020-Ohio-6671, 170 N.E.3d 813, ¶ 7, citing *State v. Jenks*, 61 Ohio St.3d 259, 574 N.E.2d 492 (1991), paragraph two of the syllabus.   "Whether the evidence is legally sufficient to sustain a verdict is a question of law."   *Thompkins* at 386.

{¶ 55} "In contrast, when reviewing an argument challenging the weight of the evidence, the court reviews the entire record, weighs the evidence and all reasonable inferences, considers the credibility of witnesses, and determines whether, in resolving conflicts in the evidence, the finder of fact clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered."

*State v. Short*, 2017-Ohio-7200, 144 N.E.3d 1037, ¶ 21 (2d Dist.). "[T]he weight to be given to the evidence and the credibility of the witnesses are primarily for the trier of fact." *State v. DeHass*, 10 Ohio St.2d 230, 227 N.E.2d 212 (1967), paragraph one of the syllabus. "The fact that the evidence is subject to different interpretations does not render the conviction against the manifest weight of the evidence." *State v. Adams*, 2d Dist. Greene Nos. 2013-CA-61 and 2013-CA-62, 2014-Ohio-3432, ¶ 24, citing *State v. Wilson*, 2d Dist. Montgomery No. 22581, 2009-Ohio-525, ¶ 14. "The discretionary power to grant a new trial should be exercised only in the exceptional case in which the evidence weighs heavily against the conviction." *State v. Martin*, 20 Ohio App.3d 172, 175, 485 N.E.2d 717 (1st Dist.1983).

### b. Analysis

{¶ 56} Walker was convicted of two counts of having weapons while under disability, each in violation of R.C. 2923.13(A)(3). That statute provides, in pertinent part, as follows:

(A) Unless relieved from disability under operation of law or legal process, no person shall knowingly acquire, have, carry, or use any firearm or dangerous ordnance, if any of the following apply:

* * *

(3) The person is under indictment for or has been convicted of any felony offense involving the illegal possession, use, sale, administration, distribution, or trafficking in any drug of abuse[.]

{¶ 57} Walker does not dispute that he was under a disability as charged by the

State. However, he contends that the State failed to prove that he knowingly acquired, had, carried, or used either of the firearms recovered from 1460 Tampa Avenue.

{¶ 58} "Knowingly" is defined by R.C. 2901.22(B) as follows:

A person acts knowingly, regardless of purpose, when the person is aware that the person's conduct will probably cause a certain result or will probably be of a certain nature. A person has knowledge of circumstances when the person is aware that such circumstances probably exist. When knowledge of the existence of a particular fact is an element of an offense, such knowledge is established if a person subjectively believes that there is a high probability of its existence and fails to make inquiry or acts with a conscious purpose to avoid learning the fact.

{¶ 59} "In order to 'have' a firearm for purposes of R.C. 2923.13, a person must actually or constructively possess it." *State v. Donley*, 2017-Ohio-562, 85 N.E.3d 324, ¶ 54 (2d Dist.), citing *State v. Fleming*, 2d Dist. Clark No. 2014-CA-136, 2015-Ohio-5382, ¶ 26. The State proceeded at trial on the theory that Walker had constructively possessed the firearms at issue. "Constructive possession can be sufficient to support a charge of having weapons under disability." *State v. Cherry*, 171 Ohio App.3d 375, 2007-Ohio-2133, 870 N.E.2d 808, ¶ 10 (2d Dist.). "Constructive possession exists when an individual knowingly exercises dominion and control over an object, even though that object may not be within his immediate physical possession." *State v. Hankerson*, 70 Ohio St.2d 87, 434 N.E.2d 1362 (1982), syllabus.

{¶ 60} In this case, Walker was observed over the course of nearly two years to

be the main individual coming and going from 1460 Tampa Avenue; he also controlled who could enter the home. With the exception of Walker's wife, who was only seen entering the home alone on a few occasions, anyone else entering the home was let in by Walker. Walker had a key to the property and a garage door opener, and there were bills in his name for the property. Based on the evidence presented, Walker exercised dominion and control over 1460 Tampa Avenue and its contents. The fact that Walker did not own the home did not invalidate his ability to exercise dominion and control over the home. While this alone would be insufficient evidence to prove that Walker knowingly possessed the firearms, additional evidence was presented by the State. At the time the search warrant was executed, the police provided ample warning of their imminent entry, which was made over a bullhorn and by yelling and knocking at the door. Multiple officers stated that they waited at least 20 seconds before forcing entry to the home after announcing their presence. When officers entered the home, Walker was in the living room within arm's reach of where one of the firearms was stuffed into a chair. A reasonable trier of fact could have reasonably inferred that Walker hid the firearm in the chair near him immediately prior to the police entry.

{¶ 61} As to the firearm recovered from inside the vent, which was also located in the living room, evidence probative of Walker's dominion or control over the gun was presented by the State through the testimony of Mary Barger. Barger testified that she found a partial mixed profile of DNA from the swabs from the gun found in the vent. From the mixed partial profile, she could not exclude Walker as being a part of the mixture, which meant that when she looked at the mixed DNA profile and compared it to Walker's

known DNA standard, she could see his specific DNA types present within the mixed profile.   Barger also verified that the sex marker of the mixed partial profile on the firearm from the vent contained male DNA.

{¶ 62} Viewing the evidence discussed above in a light most favorable to the prosecution, a reasonable fact finder could have inferred from the surrounding facts and circumstances and found beyond a reasonable doubt that Walker had been aware of each of the handguns and had been in constructive possession of them.   Therefore, the evidence was sufficient to find that he knowingly had the firearms.

{¶ 63} Having found sufficient evidence to support Walker's convictions, we turn now to his manifest weight claim.   "Although a court of appeals may determine that a judgment of a trial court is sustained by sufficient evidence, that court may nevertheless conclude that the judgment is against the weight of the evidence."   *Thompkins*, 78 Ohio St.3d at 387, 678 N.E.2d 541.   As noted previously, a challenge to the weight of the evidence is analytically distinct from a challenge to the sufficiency of the evidence.   *Id.* at paragraph two of the syllabus.   "A weight of the evidence argument challenges the believability of the evidence and asks which of the competing inferences suggested by the evidence is more believable or persuasive."   (Citation omitted.) *Wilson*, 2d Dist. No. 22581, 2009-Ohio-525, at ¶ 12.

{¶ 64} Walker frames his manifest weight challenge by stating that "there was no credible evidence" admitted at trial to support his convictions and, further, that the DNA evidence presented at trial "was not credible to establish possession."   Walker's argument is more akin to a sufficiency argument than a separate manifest weight

argument. Nevertheless, based on our review of the evidence submitted at trial, we cannot conclude that the trier of fact clearly lost its way and created a manifest miscarriage of justice to warrant a reversal.

{¶ 65} The trial of fact could reasonably have concluded that Walker had dominion and control of 1460 Tampa Avenue and its contents. Although the home was owned by Walker's brother, it was Walker who was observed coming and going freely from the home and granting people entrance. Other than Walker's wife, who was observed only on a few occasions entering the home by herself, no one else entered the home without Walker's permission. Walker had keys to the home, a garage door opener, unrestricted access to the home and garage, received mail at the home, and received bills for the home. No mail or bills connected to 1460 Tampa Avenue in anyone else's name were recovered. Additionally, based on Walker's proximity to the firearm in the chair and the DNA analysis results from the firearm in the vent, the trial court could have reasonably concluded that Walker had constructive possession of the two firearms. Although the evidence may have been circumstantial, we note that circumstantial evidence has the same probative value as direct evidence. *Jenks*, 61 Ohio St.3d 259, 574 N.E.2d 492, at paragraph one of the syllabus.

{¶ 66} Although Fletcher testified that other people had access to the home and that he and Walker were just eating lunch when the police arrived with the search warrant, the trier of fact was permitted to believe all, some, or none of the testimony of each witness that appeared before it. *State v. Antill*, 176 Ohio St. 61, 67, 197 N.E.2d 548 (1964). The fact that the trier of fact credited the State's evidence over the defense's

evidence does not warrant a reversal on manifest weight grounds. This is not the exceptional case where the evidence weighed heavily against the conviction.

{¶ 67} Walker's first and second assignments of error are overruled.

### IV. Ineffective Assistance of Counsel

{¶ 68} In his third assignment of error, Walker contends that his trial counsel was ineffective for two reasons. First, Walker contends trial counsel was ineffective for failing to make a separate closing argument during the bench trial portion of his case. Secondly, Walker argues that counsel was ineffective for failing to argue at his sentencing hearing in mitigation of his sentence. We find no merit to either argument.

### a. Standard of Review

{¶ 69} "In order to prevail on an ineffective-assistance-of-counsel claim, a defendant must prove that counsel's performance was deficient and that the defendant was prejudiced by counsel's deficient performance." (Citations omitted.) *State v. Davis*, 159 Ohio St.3d 31, 2020-Ohio-309, 146 N.E.3d 560, ¶ 10. "Thus, the defendant must demonstrate that counsel's performance fell below an objective standard of reasonableness and that there exists a reasonable probability that, but for counsel's error, the result of the proceeding would have been different." *Id*. "The failure to make a showing of either deficient performance or prejudice defeats a claim of ineffective assistance of counsel." *State v. Dean*, 2018-Ohio-1317, 110 N.E.3d 739, ¶ 34 (2d Dist.), citing *Strickland v. Washington*, 466 U.S. 668, 697, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984).

{¶ 70} In evaluating counsel's performance, "a court must indulge a strong

presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances the challenged action 'might be considered sound trial strategy.' " *Strickland* at 689, quoting *Michel v. Louisiana*, 350 U.S. 91, 101, 76 S.Ct. 158, 100 L.Ed. 83 (1955).

### b. Closing Argument

{¶ 71} Although Walker's attorney made a closing argument to the jury for the jury trial portion of his case, he argues that his attorney was ineffective for failing to make a separate closing argument for the bench trial portion of his case.   According to Walker, this failure was detrimental to his case, because "[t]he trial judge was left to only consider the testimony from trial, without hearing any relevant argument regarding whether Appellant was in possession of a gun, was aware that guns were located in a place where he did not reside, or how the evidence did not suggest Appellant even handled any of the firearms that were seized."   Appellant's Brief, p. 11.   Walker further argues that he was prejudiced by trial counsel's failure to make a second closing argument, because he was found guilty of two counts of having weapons while under disability and given maximum sentences despite "what little evidence was actually presented at trial to implicate [him] for being in possession of a firearm."   *Id.* at 12.

{¶ 72} "[C]losing argument for the defense is a basic element of the adversary factfinding process in a criminal trial."   *Herring v. New York*, 422 U.S. 853, 858, 95 S.Ct. 2550, 45 L.Ed.2d 593 (1975).   Nevertheless, a defendant may waive the right to present a closing argument, either by failing to request it or failing to object to the omission of

closing arguments. *State v. McCausland*, 124 Ohio St.3d 8, 2009-Ohio-5933, 918 N.E.2d 507, syllabus. But trial counsel's waiver of closing argument does not in itself constitute ineffective assistance of counsel. This is because "counsel's decision to waive opening or closing statements is generally viewed as a tactical one, even in a capital case." *State v. Belton*, 149 Ohio St.3d 165, 2016-Ohio-1581, 74 N.E.3d 319, ¶ 139.

{¶ 73} In this case, Walker made two Crim.R. 29 motions for acquittal that were denied. Tr. 673, 692. In his first Crim.R. 29 motion, which was made immediately after the State rested its case-in-chief, Walker's counsel argued that he should be acquitted of both the drugs and the gun charges. While the trial court overruled Walker's motion relating to the drug offenses, it took the matter under advisement for the three counts of having a weapon while under disability, since those charges were being tried to the bench. Walker's second Crim.R. 29 motion, which was made at the close of the defense's case, merely reiterated his prior arguments and was overruled based on the trial court's prior decision overruling the first Crim.R. 29 motion.

{¶ 74} Thereafter, the State gave a closing argument, Walker's attorney gave a closing argument, and the State presented a rebuttal closing argument. Following the jury's reading of the verdicts, the trial concluded. No further evidence was admitted, and no additional arguments were made by either party regarding the bench trial portion of the trial.

{¶ 75} The jury trial was completed on April 27, 2022. The trial court's written decision finding Walker guilty of two of the three counts of having weapons while under disability was not filed until May 12, 2022. At no time during trial or after the trial did

Walker request an opportunity to make any additional arguments related solely to the bench trial portion of the case, or object to its omission. Assuming without deciding that Walker had a right to a separate closing argument, any right Walker may have had was waived. But waiving a closing argument does not automatically rise to the level of ineffective assistance of counsel because it may be the result of a tactical decision. *See State v. Bradley*, 42 Ohio St.3d 136, 144, 538 N.E.2d 373 (1989) (counsel's omission of an opening statement and the substance of closing arguments "must be viewed as tactical decisions and do not rise to the level of ineffective assistance").

{¶ 76} The trial court stated in its written verdict that it had relied upon the testimony and evidence submitted during the jury trial to render a decision. This necessarily included Walker's closing argument made to the jury. While the bench trial involved different charges than those presented to the jury, there was significant cross-over considering that the firearms presented as the basis for the having weapons while under disability charges were the same firearms presented by the State for the firearm specifications on the drug charges. Additionally, Walker's defense throughout the trial was that he did not have dominion and control over 1460 Tampa Avenue or any of the items found inside the home, including the two firearms. He further argued that the evidence was insufficient to convict him beyond a reasonable doubt and specifically addressed the lack of direct evidence tying him to the drugs and guns. Because trial counsel had already made arguments to the trial court that would have supported an acquittal for the charges of having a weapon while under a disability, and closing arguments were made before the jury which were heard by the court, trial counsel could

have reasonably concluded that any further closing argument would be unnecessary or repetitive. Given the "strong presumption" that counsel's performance constituted reasonable assistance, counsel's actions must be viewed as tactical decisions and did not rise to the level of ineffective assistance.

{¶ 77} Furthermore, Walker has not established that he was prejudiced as a result of trial counsel's perceived error. The fact that the trial court found him not guilty on one count of having weapons while under disability undermines his argument that he was prejudiced. But more importantly, he did not identify any additional arguments trial counsel could have made that would likely have changed the outcome of the case. Under these circumstances, we cannot conclude that trial counsel acted deficiently or that there was any reasonable probability of a different outcome if defense counsel had made an additional closing argument.

### c. Allocution

{¶ 78} Walker further asserts that his trial counsel was ineffective for failing to provide mitigating statements to the trial court prior to sentencing. According to Walker, "[t]rial counsel failed to make a record, let alone any argument regarding what an appropriate sentence would be, and as a result the trial judge imposed maximum terms * * * and ordered the sentences to run consecutive to one another." Appellant's Brief at p. 12. In support of his argument, Walker relies on Crim.R. 32(A)(1), which provides that at the time of sentencing, a trial court shall "[a]fford counsel an opportunity to speak on behalf of the defendant." In this case, trial counsel was afforded an opportunity to speak at the time of sentencing but declined to say anything. We cannot conclude that this

amounted to ineffective assistance of counsel for at least two reasons.

{¶ 79} First, even if we were to assume that counsel performed deficiently in failing to present any mitigation at the time of sentencing, Walker has not demonstrated "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694, 104 S.Ct. 2052, 80 L.Ed.2d 674. The trial court stated that it had considered the purposes and principles of sentencing and had reviewed the presentence investigation report. The report identified the level of felony offenses of which Walker had been convicted and that Walker had a prior felony conviction that had occurred several years earlier for which he received the minimum prison sentence. Knowing this information, the trial court still imposed a maximum consecutive sentence. Thus, had trial counsel pointed out this information during sentencing, as Walker suggests on appeal, it would not have changed the outcome of the case.

{¶ 80} Secondly, Walker argues that defense counsel should have made mitigating statements but does not identify what mitigating evidence should have been presented in addition to what was contained in the presentence investigation report. To the extent Walker would need to rely on evidence outside the record to demonstrate additional mitigating evidence that should have been submitted to the trial court but was not, this type of evidence is " 'not appropriately considered on a direct appeal,' " *State v. Spaulding*, 151 Ohio St.3d 378, 2016-Ohio-8126, 89 N.E.3d 554, ¶ 102, quoting *State v. Madrigal*, 87 Ohio St.3d 378, 391, 721 N.E.2d 52 (2000).

{¶ 81} Because Walker has not demonstrated either deficient performance or a

reasonable probability that the result of his sentencing would have been any different, his third assignment of error is overruled.

## V. Consecutive Sentences

{¶ 82} In his fifth assignment of error, Walker acknowledges that the trial court made the statutory findings under R.C. 2929.14(C)(4) to support the imposition of consecutive sentences. However, he challenges the trial court's additional findings under R.C. 2929.14(C)(4)(b) and (c) contending that the record does not clearly and convincingly support those findings. We disagree.

{¶ 83} When reviewing felony sentences, we apply the standard of review set forth in R.C. 2953.08(G). *State v. Jones*, 163 Ohio St.3d 242, 2020-Ohio-6729, 169 N.E.3d 649, ¶ 27, citing *State v. Marcum*, 146 Ohio St.3d 516, 2016-Ohio-1002, 59 N.E.3d 1231, ¶ 21. Under that statute, an appellate court may increase, reduce, or otherwise modify a sentence, or vacate it all together and remand for resentencing, if it clearly and convincingly finds either: (1) the record does not support certain specified findings, including the sentencing court's consecutive sentencing findings under R.C. 2929.14(C)(4), or (2) that the sentence imposed is contrary to law. *Marcum* at ¶ 9, citing R.C. 2953.08(G)(2). "Clear and convincing evidence is that measure or degree of proof which is more than a mere 'preponderance of the evidence,' but not to the extent of such certainty as is required 'beyond a reasonable doubt' in criminal cases, and which will produce in the mind of the trier of facts a firm belief or conviction as to the facts sought to be established." *Cross v. Ledford*, 161 Ohio St. 469, 120 N.E.2d 118 (1954), paragraph three of the syllabus.

{¶ 84} When multiple prison terms are imposed, there is a presumption that those sentences will run concurrently rather than consecutively. R.C. 2929.41(A). However, R.C. 2929.14(C)(4) permits a trial court to impose consecutive sentences if certain findings are made. R.C. 2929.14(C)(4) provides that:

If multiple prison terms are imposed on an offender for convictions of multiple offenses, the court may require the offender to serve the prison terms consecutively if the court finds that the consecutive service is necessary to protect the public from future crime or to punish the offender and that consecutive sentences are not disproportionate to the seriousness of the offender's conduct and to the danger the offender poses to the public, and if the court also finds any of the following:

(a) The offender committed one or more of the multiple offenses while the offender was awaiting trial or sentencing, was under a sanction imposed pursuant to section 2929.16, 2929.17, or 2929.18 of the Revised Code, or was under post-release control for a prior offense.

(b) At least two of the multiple offenses were committed as part of one or more courses of conduct, and the harm caused by two or more of the multiple offenses so committed was so great or unusual that no single prison term for any of the offenses committed as part of any of the courses of conduct adequately reflects the seriousness of the offender's conduct.

(c) The offender's history of criminal conduct demonstrates that consecutive sentences are necessary to protect the public from future crime by the

offender.

{¶ 85} "In order to impose consecutive terms of imprisonment, a trial court is required to make the findings mandated by R.C. 2929.14(C)(4) at the sentencing hearing and incorporate its findings into its sentencing entry, but it has no obligation to state reasons to support its findings." *State v. Bonnell*, 140 Ohio St.3d 209, 2014-Ohio-3177, 16 N.E.3d 659, syllabus.

{¶ 86} Having reviewed the record, we lack a firm belief or conviction that the evidence failed to support the trial court's findings under R.C. 2929.14(C)(4). The trial court made the appropriate consecutive sentencing findings, as well as the additional findings under R.C. 2929.14(C)(4)(b) that "the harm caused by two or more of the multiple offenses * * * was so great or unusual that no single prison term for any of the offenses committed as part of any of the courses of conduct adequately reflects the seriousness of the offender's conduct;" and R.C. 2929.14(C)(4)(c) that Walker's history of criminal conduct demonstrated that consecutive sentences were necessary to protect the public. These findings were stated on the record at the time of sentencing and included in the judgment entry.

{¶ 87} According to the presentence investigation report, which the trial court stated it reviewed, Walker was 47 years old and had several prior misdemeanor and felony convictions as an adult. He had previously been convicted of multiple misdemeanor disorderly conduct and noise offenses, had been sentenced to community control sanctions for a felony theft offense in the Montgomery County Common Pleas Court, and had been convicted of second-degree felony trafficking in cocaine and

possession of cocaine and third-degree conspiracy to traffic in drugs offenses in the Hamilton County Common Pleas Court, where he was sentenced to a prison term. Under R.C. 2929.14(C)(4)(c), the trial court had ample evidence to support consecutive sentences.

{¶ 88} Having determined that the record supported the trial court's finding under R.C. 2929.14(C)(4)(c), we need not decide whether it also supported the trial court's additional findings under R.C. 2929.14(C)(4)(b). "To impose consecutive sentences, only one of the three potential findings under R.C. 2929.14(C)(4)(a), (b), and (c) was required." *State v. Parrish*, 2d Dist. Clark No. 2022-CA-89, 2023-Ohio-2409, ¶ 24.

{¶ 89} Because the trial court made the necessary findings for consecutive sentences, and the record does not clearly and convincingly fail to support those findings, the trial court did not err in imposing consecutive sentences. Walker's fifth assignment of error is overruled.

## VI. Conclusion

{¶ 90} Having overruled all of Walker's assignments of error, the judgment of the trial court is affirmed.

. . . . . . . . . . . . .

WELBAUM, J. and TUCKER, J., concur.